UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-60056-CR-RUIZ

UNITED STATES OF AMERICA

vs.

BRANDON MICHAEL FLEURY,

    Defendant.
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

The United States of America, by and through the undersigned counsel, hereby responds in opposition to the Defendant's Motion to Dismiss [DE #48, 50]. The motion should be denied. Contrary to the Defendant's contention, the statute charged in Counts 2, 3, and 4 – 18 U.S.C. § 2261A(2)(B) – is not facially overbroad because it targets a broad range of conduct beyond speech and requires a criminal intent element that places penalized speech outside the First Amendment's protection. The Defendant's as-applied challenge also fails because his speech was not a matter of public concern and is not constitutionally protected.

    **I.**    **FACTUAL BACKGROUND**

As alleged in the Indictment [DE #18], and further described in the Criminal Complaint [DE #1], between December 2018 and January 11, 2019, the Defendant engaged in a course of conduct to harass, intimidate, and threaten relatives and friends of students and others killed during the February 14, 2018, mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida (the "MSD shooting"). Using a series of different Instagram accounts, the Defendant made dozens of posts that "mentioned" or "tagged" the relatives and friends of these MSD shooting

1

victims by inserting their Instagram usernames into the Defendant's messages.[1] These individuals included, among others, three people described in the Indictment as Victims 1, 2, and 3 (hereinafter, collectively, "the victims"). Victim 1 is a teenage survivor of the MSD shooting, whose sister was among those killed in the shooting. Victim 2 is also a teenage survivor of the shooting and was the best friend of Victim 1's sister. Victim 3 is the father of one of the students killed in the MSD shooting.

In late December 2018, the Defendant began posting Instagram comments "mentioning" the victims using an Instagram username "nikolas.killed.your.sister." The username, like several others the Defendant used during his course of conduct, was a reference to Nikolas Cruz, the person accused of committing the MSD shooting. Indeed, in writing as "nikolas.killed.your.sister," the Defendant spoke in the first-person as if he himself were Nikolas Cruz. On December 22, 2018, three days before Christmas, the Defendant used the "nikolas.killed.your.sister" account to "mention" Victim 1 in posts stating, among other things,[2] the following:

- "I killed your loved ones hahaha"
- "Cry for me"
- "Your grief is my joy"
- "With the power of my AR-15, I erased their existence [followed by smiling, applause, and handgun emojis[3]]"

---

[1] As described in the Indictment, when one Instagram user "mentions" another user, the mentioned user receives a notification displaying the content of the comment or post. Thus, while the comments were posted on an Instagram page accessible to Instagram users at large, the comments were directed at, and delivered to, those victims "mentioned" in them.

[2] Given the volume of the Defendant's comments, the Government has not listed every comment the Defendant made. However, those quoted herein are representative samples of the Defendant's comments.

[3] Emojis are small pictures or symbols used in text messaging or posts on social media to convey emotions or represent things or ideas.

- "I gave them no mercy"
- "They had their whole lives ahead of them and I fucking stole it from them [followed by three "crying while laughing" emojis and the words "hahaha"]"
- "I took [Victim 1's sister] away from you [followed by a string of "blowing a kiss" emojis]"
- "I took [Victim 1's sister] away from you.  You'll never see her again hahaha"
- "I took a shit on your sister's grave [followed by a "crying while laughing" emoji, an applause emoji, and three "poop" emojis]."

The Defendant "mentioned" Victim 2 in some of the above-quoted posts, as well as other comments stating:

- "I killed your friends, baby girl"
- "I'm a murderer"
- "Did you like my Valentines gift?  I killed your friends"
- "I killed [Victim 1's sister/Victim 2's friend] and it was fun"
- "You'll never see her again boo."

The Defendant "mentioned" Victim 3 in additional comments, including the following, among others:

- "I killed your son"
- "I murdered [Victim 3's son].  I took him away from you"
- "I killed [Victim 3's son] and it was fun."

On December 24, 2018, the Defendant used three other Instagram accounts – with usernames "bullseyetauntsyou__.", "angie.and.lola", and "nik.taunts_" – to continue taunting Victims 1, 2, and 3 with similar messages about how "Nikolas" killed their loved ones.  The

messages from "nik.taunts_" were again written in the first-person as Nikolas Cruz, boasting, for example, "I shot [Victim 3's son] dead [Victim 3]. It was fun. You miss him huh? How's your Christmas without him?"

On December 25, the Defendant – now using an account with the username "teddykillspeople" and a profile picture of 1970s serial killer Ted Bundy – "mentioned" all three victims, and others, in a message reading, "I'm your abductor [smile and applauding emojis] I'm kidnapping you fool [followed by two emojis showing a lock, as well as applauding and "blowing a kiss" emojis]."[4] A subsequent message claimed, "I killed Janice Ott and Denise Naslund," both of whom were victims of Ted Bundy.

The Defendant continued to "mention" the victims in comments through January 11, 2019, using various different Instagram accounts, with usernames including, among others, "tedtheabductor," "nikolasthemurderer," "the.douglas.shooter," and "nikolas.the.murderer_." While these comments continued to taunt the victims about the deaths of their loved ones in the MSD shooting, some of the messages also suggested the ability and desire to kill others, including the victims and their living family members. For example, writing as "the.douglas.shooter," the Defendant said:

- "With the power of my AR-15, you all die"
- "I'm a murderer. It's what I do, fool"
- "I'm a homicidal outrage, mother***ers!"
- "With the power of my AR-15, I take your loved ones away from you PERMANENTLY"

---

[4] This communication is the basis for Count 1, charging the Defendant with transmitting a communication containing a true threat, in violation of 18 U.S.C. § 875(c).

- "Hahaha! I'm the Douglas shooter! SCREAM!!"

Based on this course of conduct, the Indictment charges the Defendant with one count of transmitting a communication containing a true threat, in violation of 18 U.S.C. § 875(c) (Count 1), and three counts of using a facility of interstate commerce, with intent to harass and intimidate, to engage in a course of conduct that caused, attempted to cause, or would reasonably be expected to cause substantial emotional distress, in violation of 18 U.S.C. § 2261A(2)(B) (Counts 2, 3, and 4). Counts 2, 3, and 4 are predicated on the Defendant's course of conduct towards Victims 1, 2, and 3, respectively.

## II. ANALYSIS

### A. 18 U.S.C. § 2261A(2)(B) is Not Facially Overbroad.

The offense defined in 18 U.S.C. § 2261A(2)(B) is not facially overbroad. Under the First Amendment overbreadth doctrine, a Court may only find a statute to be facially overbroad based on a showing that the law "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep[.]'" *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). The Defendant has not, and cannot, make such a showing.

The statute penalizes whoever:

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that -- causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to that person, an immediate family member of that person, [or] a spouse or intimate partner of that person.

18 U.S.C. § 2261A(2)(B).  Therefore, the statute requires proof of four elements: (1) the defendant engaged in a course of conduct; (2) the defendant acted with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person; (3) the defendant used a facility of interstate commerce; and (4) the defendant's course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress. *United States v. Ackell*, 907 F.3d 67, 72 (1st Cir. 2018).

All three United States courts of appeals that have considered facial overbreadth challenges to 18 U.S.C. § 2261A(2)(B) have rejected those challenges.  *See United States v. Petrovic*, 701 F.3d 849 (8th Cir. 2012); *United States v. Osinger*, 753 F.3d 939 (9th Cir. 2014); *United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014); *United States v. Ackell*, 907 F.3d 67 (1st Cir. 2018).  These courts have all rejected facial overbreadth challenges for the same two reasons.

First, the statute is directed towards "courses of conduct," not speech.  "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or conduct necessarily associated with speech."  *Hicks*, 539 U.S. at 124.  "By its own terms, § 2261A(2)(B) regulates not speech, but … 'course[s] of conduct.'"  *Ackell*, 907 F.3d at 73; *see also Petrovic*, 701 F.3d at 856; *Osinger*, 753 F.3d at 944.  As described in *Ackell*, while the statute could theoretically reach expressive conduct, the plain terms of the statute cover "countless amounts of unprotected conduct," including non-speech conduct.  *Ackell*, 907 F.3d at 73.  The First Circuit similarly rejected the notion that the statute targets speech simply because it lists several common means of communication among the possible facilities of interstate commerce that could be used to commit the offense, particularly because those facilities can be used for non-speech conduct as well as for speech.  *Id.  Cf. United States v. Eckhardt*, 466 F.3d

938 (11th Cir. 2006) (rejecting facial challenge to statute criminalizing telephone calls made with intent to abuse, threaten, or harass).

Second, to the extent the statute does proscribe speech, the statute's criminal intent requirements narrow the statute's scope to speech that is unlikely to be constitutionally protected. "Because the statute requires both malicious intent on the part of the defendant and substantial harm to the victim, '[i]t is difficult to imagine what constitutionally-protected speech would fall under these statutory provisions.' Most, if not all, of the [statute's] legal applications are to conduct that is not protected by the First Amendment." *Petrovic*, 701 F.3d at 856 (quoting *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004)); s*ee also Osinger*, 753 F.3d at 944 ("We agree with the Eighth Circuit's rationale [in *Petrovic*] that, because 18 U.S.C. § 2261A proscribes harassing and intimidating conduct, the statute is not facially invalid under the First Amendment."). The Eleventh Circuit, reviewing a conviction for a similar statute criminalizing harassing and threatening telephone calls, similarly concluded that phone calls made with "an overarching purpose…to harass and frighten" were "not constitutionally protected." *Eckhardt*, 466 F.3d at 944. The First Circuit has also agreed with this reasoning also, stating that "the law is clear in that it targets conduct, specifically 'conduct performed with serious criminal intent,' rather than speech protected by the First Amendment." *Ackell*, 907 F.3d at 74. Specifically, the First Circuit found that speech that amounts to criminal harassment and intimidation would constitute either "true threats" or speech that is "integral to proscribable criminal conduct," both of which are categories of speech beyond the First Amendment's protection. *Id*. at 76.

Because the statute targets conduct, not speech, and the speech that it does proscribe is speech made with a criminal intent, the statute does not punish a substantial amount of protected

free speech in relation to the statute's plainly legitimate sweep.   Therefore, the statue is not facially overbroad.

### B. 18 U.S.C. § 2261A(2)(B) is Not Unconstitutional As Applied to the Defendant.

The statute is not unconstitutional as applied to the Defendant and his course of conduct. The Defendant's comments, made with the intent to harass and intimidate, fall within the "true threats" exception to the First Amendment.   Moreover, his speech was not on a matter of public concern and is distinguishable from the cases on which the Defendant relies.

#### 1.  True Threats

The Defendant erroneously states that his course of conduct does not fall into any of the historical categories of unprotected speech.   However, the Defendant's conduct included "true threats."   As discussed above, courts have recognized that speech made with the serious criminal intent to harass and intimidate amounts to "true threats" and is not protected by the First Amendment.   *Eckhardt*, 466 F.3d at 944; *Ackell*, 907 F.3d at 74.

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.   The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Virginia v. Black*, 538 U.S. 343, 359 (2003) (internal citations omitted).   The clearest example of the Defendant making a "true threat" is his December 25, 2018, comment stating, "I'm your abductor [smile and applauding emojis] I'm kidnapping you fool [followed by two emojis showing a lock, as well as applauding and "blowing a kiss" emojis]."   This comment communicated a

8

"serious expression of an intent to commit an act of unlawful violence" toward the victims tagged in the message. The fact that the Defendant used the username "teddykillspeople" and followed it with an assertion that he had, in fact, killed two people, clearly communicated to the victims that he had the capability and intent to kidnap, kill, or otherwise harm. Rather than revealing himself to be a 21-year-old residing in California, the Defendant instead chose to mask his true identity and present himself as one of history's most notorious serial killers. Victims 1, 2, and 3 did not know who sent the message, where the sender lived, or why the sender specifically targeted them. All they knew was that someone threatened to kidnap them and did so anonymously with a profile bearing the image and name of Ted Bundy. This demonstrated an intent to for this threat to be taken seriously.[5]

The kidnapping threat was not the only part of the Defendant's course of conduct that falls within the category of "true threat." In various messages spread over multiple days, the Defendant spoke in the persona of MSD shooter Nikolas Cruz and proclaimed to the victims:

- "I'm a murderer"
- "With the power of my AR-15, **you all die**"
- "I'm a murderer. It's what **I do**, fool"
- "I'm a homicidal outrage, mother***ers!"
- "With the power of my AR-15, **I take your loved ones away** from you PERMANENTLY"

---

[5] Notably, the Defendant has not sought to dismiss Count 1, which is predicated on this particular communication.

(emphasis added). Rather than simply celebrating the past deaths of the victims' loved ones, as the Defendant did in so many of his messages, here the Defendant used the present tense and implied an ongoing intent to commit future, not just past, acts of violence. Stating "you all die," addresses the still-living victims directly. Saying "I **take** your loved ones away from you," rather than "I **took**," displays an ongoing intent and ability to kill those still alive, rather than those already murdered.

While the Defendant's numerous other messages – taunting the victims over the deaths of their loved ones, demanding that they scream or cry, or otherwise laughing at their pain – in isolation do not communicate specific threats, the Court must view each of the Defendant's communications within the context of the entire course of conduct. With each message, the Defendant created the image of an anonymous, persistent tormentor out to harm the victims and cause them further anguish. That image gave the victims further reason to take the more directly threatening comments seriously. In other words, all of the Defendant's messages contributed to the sense of fear that the "true threats" doctrine is meant to allow the law to prevent.

2. Public Concern

The Defendant argues that his harassing and intimidating conduct was nonetheless protected speech because it addressed a "matter of public concern." On the contrary, his speech served only to threaten and taunt the victims and their private pain without any reference to an ongoing public issue.

Speech addressing matters of public concern does receive greater First Amendment protection than speech on purely private matters. *Snyder v. Phelps*, 562 U.S. 443 (2011). While speech on public affairs and public issues must remain uninhibited and robust, restricting speech

10

on "matters of purely private significance" "does not implicate the same constitutional concerns" because "there is no threat to the free and robust debate of public issues [or] potential interference with a meaningful dialogue of ideas." *Id*. at 452 (internal citations omitted). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community. . .or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. at 453 (internal citations omitted). However, there is no bright line rule for deciding whether speech is on a matter of private or public concern; in evaluating whether speech is on a matter of public concern, the Court must consider "the content, form, and context" of the speech. *Id*. at 452-54.

Considering the content, form, and context of the Defendant's speech reveals that it was not on a matter of public concern. While the MSD shooting undoubtedly received significant media attention, and spawned public debate on a number of political and social issues that continue to be of public interest, the Defendant's messages and comments did not address those matters at all. For example, the Defendant's comments contained absolutely no assertions about, or references to, school safety, gun control, or treatment of mental illness. He said nothing about the victims' statements or positions on such issues, nor did he provide any critique or information to undermine the victims or any beliefs they may espouse. The Defendant's comments did not inform, argue, advocate, educate, explain, justify, or criticize. They did not urge or suggest any course of action other than telling the victims to cry, scream, and "eat poop." In short, the Defendant's comments did not engage, even crudely, in anything recognizable as discussion or debate on any topic that would be of interest to anyone beyond those directly involved in the tragic events he described. Rather they related only to the very private matter of the victims' grief.

In arguing that his speech was on a matter of public concern, the Defendant cites to *Snyder* and *United States v. Cassidy*, 814 F. Supp. 2d 574 (D. Md. 2011). The content of the Defendant's speech is distinguishable from the speech involved in both *Snyder* and *Cassidy*. In *Snyder*, members of the Westboro Baptist Church carried signs at a military service member's funeral asserting, "God Hates Fags," "God Hates the USA," "Priests Rape Boys," and "Fags Doom Nations." 562 U.S. at 454. The Supreme Court found that these signs highlighted several political and social issues – the political and moral conduct of the United States, the fate of the United States, acceptance of homosexuality in general and in the military specifically, and scandals involving the Catholic Church – and conveyed the protesters' positions on these issues. *Id*. While the Court acknowledged that a few signs seemed personally directed at the deceased and his family, it concluded that "the overall thrust and dominant theme of Westboro's demonstration spoke to broader public issues." *Id*. By contrast, the Defendant's comments conveyed no positions nor showed any such "overall thrust" regarding public issues. They simply repeatedly reminded the victims of the undisputed and well-known facts that their loved ones had been horrifically murdered, and did so in a way designed to both cause the victims additional personal pain and make them believe that they were in peril.

The Defendant's course of conduct is also distinguishable from the speech involved in *Cassidy*. In *Cassidy*, a district court dismissed § 2261A(2)(B) charges brought against a defendant who criticized "A.Z.," the known leader of a religious organization with which that defendant was previously associated. 814 F. Supp. 2d 574. That court emphasized that, "[a]lthough in bad taste, Mr. Cassidy's Tweets and Blog posts about A.Z. challenge her character and qualifications as a religious leader." *Id*. at 583. A close review of the content of Cassidy's

12

tweets and blog posts, cataloged in an appendix to the dismissal order, shows that much of Cassidy's speech related to criticizing the leader's merit as a religious leader, the beliefs of her organization, and her effect on the religion. *See* 814 F. Supp. 2d at 589 (cataloging "Criticism of A.Z. as a Religious Figure and/or Criticism of KPC Belief System"). Even other more *ad hominem* derogatory comments Cassidy made could be read as criticism of A.Z.'s fitness as a religious leader. *See id*. at 590-91. By contrast, none of the Defendant's comments here allude to any of the victims' public positions or statements[6] or can be interpreted as criticism of them.

The Defendant's conduct is more analogous to the harassing phone calls at issue in *Eckhardt*. There, a former employee of a Teamsters Union local made a series of harassing calls, directed specifically to the office telephone number of one of the union's employees (whom the defendant had never met). 466 F.3d at 942. His messages were sexually explicit and only incidentally mentioned union activity. *Id*. at 942-944. While Eckhardt later claimed that his calls addressed a matter of public concern – specifically, alleged corruption within the union – the Eleventh Circuit found that "his calls rarely addressed anything that could be construed in that

---

[6] The Defendant's motion makes a brief claim that "Victims 1, 2, and 3 all have a social media presence wherein they discuss the [MSD] shooting and advocate for gun control and other policy initiatives" and points to statements he made to law enforcement suggesting he "targeted" victim family members who were activists with significant social media presences. Mot. at p. 4, 13. A closer analysis shows that, at least for Victims 1 and 2, their social media presence is not extensive and they are not well-known "activists." While Victim 2 maintains the Instagram account towards which the Defendant directed his comments, Victim 2 has made no posts of her own using that account, and her publicly available profile information makes no reference to the MSD shooting. Victim 2 has a Twitter account that includes the hashtag "#msdstrong" in her profile. But she has made only 37 Tweets using this account, only two of which referenced gun control (which were "re-tweets" of others' messages). Victim 1 keeps his Instagram page private and has made only 11 posts himself. His profile information does contain an "R.I.P." reference to his sister and her dates of birth and death, along with a hashtag related to a gun control advocacy organization his father started. His Twitter account shows 193 Tweets, only about 13 of which touch on issues of gun control or school safety. To the extent Victim 1 has become an advocate on public issues, it has largely been by referencing his father's advocacy activities. Admittedly, Victim 3 has started an organization in his son's memory and a separate organization focusing on school safety. Regardless, to the extent that the Defendant claims he was motivated by his perception of the victims as advocates, none of his speech makes any connection with victims' advocacy or any issue of public concern.

13

manner." *Id*. at 944. Rather, the Eleventh Circuit found that "the overarching purpose of Eckardt's sexually laced calls was to harass and frighten [the victim]. This type of speech is clearly not constitutionally protected." *Id*. (internal citation omitted). The Defendant's comments illustrate a similar design to harass and frighten without mention of any actual issue of public concern.

The context and form of the Defendant's comments similarly weigh against a finding that they address a matter of public concern. While the Defendant made most of his comments on a publicly available Instagram page,[7] this page was completely unrelated to the MSD shooting, gun control, school safety, or any other conceivable issue of public concern related to the MSD shooting.[8] His comments were not made in direct response to any statements by the victims nor anyone else concerning the MSD shooting, nor referred to any statements by the victims or others in a discussion of public matters elsewhere. Yet, he directed the messages specifically at the victims and others related to the MSD shooting by "mentioning" their usernames in his comments.[9] When he mentioned those killed in the MSD shooting, he often used only first names, which would be recognized by the victims to whom he targeted his comments but not likely by others reading them in such a de-contextualized forum. By putting his comments in a place so completely unrelated to any public discussion about the MSD shooting, yet directing messages designed to

---

[7] The Defendant also sent, or attempted to send, approximately 12 direct messages to Victim 1 and one direct message to Victim 2.
[8] The Defendant made most of his comments on a page for a music producer that shows no apparent connection to the victims or the MSD shooting.
[9] While Instagram users can keep their own pages private and "block" direct messages from particular other users, there is apparently no way to prevent receiving notifications of "mentions" like the Defendant used without ignoring all mentions from all users, both welcomed and not.

exacerbate private grief towards the specific individuals suffering that grief, the Defendant belied the notion that his speech was addressing matters of public concern.

It is undoubtedly true that "the hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Black*, 538 U.S. at 358 (citing *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). It is also undoubtedly true that political and social debate can be coarse, harsh, and upsetting, and that "in public debate [we] must tolerate insulting, and even outrageous, speech[.]" *Snyder*, 562 U.S. at 458 (internal citations omitted). But here, the Defendant's speech expressed no ideas of legitimate public interest nor attempted to engage in public debate. He simply harassed and intimidated the victims by issuing threats and showing glee over the death of the victims' loved ones. His conduct, therefore, is not protected by the First Amendment. On the contrary, it is criminal conduct.

### III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss should be denied.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: /s Jared M. Strauss
JARED M. STRAUSS
ASSISTANT UNITED STATES ATTORNEY
Court ID No. A5501264
500 E. Broward Blvd., Suite 700
Ft. Lauderdale, Florida 33394
(954) 356-7255 (telephone)
(954) 356-7336 (fax)
jared.strauss@usdoj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of June, 2019, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ Jared M. Strauss
JARED M. STRAUSS
Assistant United States Attorney
